IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| TRAVIS VALENTINO DANTZLER, | **No. 4:22-cv-00004-RGE-HCA** |
| Plaintiff, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| TONIA BALDWIN, MELISSA FARNSWORTH, STEPHEN WEIS, RANDY GIBBS, and BLYTHE LARSON, | |
| Defendants. [1] | |

Plaintiff Travis Valentino Dantzler brought this pro se complaint under 42 U.S.C. § 1983. Compl., ECF No. 1. The Court previously Court dismissed all claims except whether Defendants were deliberately indifferent in delaying to provide medical treatment to Dantzler. Initial Review Order 9–10, ECF No. 5.

Defendants now move for summary judgment. Defs.' Mot. Summ. J., ECF No. 21; Defs.' Br. Supp. Mot. Summ. J., ECF No. 21-1. Dantzler resists the motion. Pl.'s Resist. Defs.' Mot.

---

[1] Dantzler names all Defendants in both their individual and official capacities. Compl. 3, ECF No. 1. A claim against a state official in her official capacity is considered a claim against the state entity. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). This is because the real party in interest is the state entity. *Id.*; *cf. Ness v. City of Bloomington*, 11 F.4th 914, 922 (8th Cir. 2021) ("Claims under 42 U.S.C. § 1983 against municipal officials in their official capacities are treated as claims against the municipality." (citing *Graham*, 473 U.S. at 165–66)).

Official capacity claims require proof that a policy or custom of the entity violated the plaintiff's rights. *See Corwin v. City of Indep.*, 829 F.3d 695, 699 (8th Cir. 2016) (acknowledging § 1983 liability for a constitutional violation may attach only if violation resulted from official policy or custom (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) and *City of Canton, Ohio v. Harris*, 489 U.S. 378, 389 (1989)).

Dantzler does not allege any defendant violated a specific policy or custom of the State. As such, the claims against Defendants in their official capacities are dismissed. *Cf.* 28 U.S.C. § 1915(e)(2)(B) ("court shall dismiss the case at any time" if action is frivolous, malicious, fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune).

Summ. J., ECF No. 46. Defendants replied. Defs.' Reply Supp. Mot. Summ. J., ECF No. 47. Dantzler answered the reply and requests a hearing. Pl.'s Surreply Supp. Resist. Defs.' Mot. Summ. J., ECF No. 49. For the following reasons, the Court grants in part and denies in part Defendants' motion for summary judgment.

## I.    BACKGROUND

"On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007) (internal quotation marks omitted); *see also Michael v. Trevena,* 899 F.3d 528, 532 (8th Cir. 2018) (same).

Dantzler is currently incarcerated at the Anamosa State Penitentiary. Declaration 2, ECF No. 34 (noting change of address). During all times relevant to these claims, however, Dantzler was confined at the Clarinda Correctional Facility. Defs.' Statement of Undisputed Material Facts ¶ 3, ECF No. 21-2. He was there from January 6, 2021, until September 21, 2021. *Id.*

Dantzler first reported pain in his right knee on February 17, 2020, while he was at the Anamosa State Penitentiary. Defs.' Confidential Appx. Supp. Mot. Summ J. 4, ECF No. 22. He reported injuring his knee several days earlier. *Id.* A nurse prescribed ibuprofen and issued a knee sleeve to Dantzler. *Id.*

Another nurse saw Dantzler again on February 29, 2020, and he continued Dantzler's ibuprofen prescription for an additional week. *Id.* at 7. On March 13, 2020, a third nurse saw Dantzler for his knee pain. *Id.* at 9. The nurse restricted Dantzler to a lower bunk and from all sports. *Id.* The nurse also allowed Dantzler to have a brace/walker, and scheduled Dantzler to see a physician. *Id.*

On March 26, 2020, Dr. Michael Dehner examined Dantzler at the Anamosa penitentiary. *Id.* at 11. Dantzler reported slow improvement with his knee injury and requested guidance for

rehabilitation. *Id.* The doctor noted slight swelling, but no instability was observed, and Dantzler had good range of motion. *Id.* Dehner diagnosed Dantzler with a knee sprain, and prescribed six weeks of rehabilitation exercise as well as nonsteroidal anti-inflammatory drugs. *Id.*

Dehner discontinued the anti-inflammatory medication on April 16, 2020, due to noncompliance with medicine regimen. *Id.* at 13.

On July 6, 2020, Dantzler reinjured his knee playing basketball, and saw a nurse the same day. ECF No. 22 at 15. The nurse noted Dantzler was limping and had localized swelling in his right knee. *Id.* After consultation with Dehner, the nurse encouraged Dantzler to continue wearing his knee brace, restricted Dantzler from all sports for three months, and directed him to use ice for swelling. *Id.* at 15–16. The nurse also scheduled an appointment for Dantzler to see the doctor in one week. *Id.* at 16.

Dehner examined Dantzler on July 16, 2020. ECF No. 22 at 18. At this appointment Dehner observed Dantzler's knee was "more swollen than last time," and noted joint line tenderness but no instability. *Id.* He continued his orders for rest, ice, ibuprofen, rehabilitation, and a prohibition from sports. *Id.*

On December 27, 2020, Dantzler reported severe pain in his right knee. *Id.* at 22. He stated his knee has "been this way since February." *Id.* He requested an MRI because he was certain there was some structural damage and at times could "barely walk. *Id.*

A nurse examined Dantzler on December 30, 2020. *Id.* at 23. She noted that his knee was swollen but not warm to the touch. *Id.* She allowed him to use a knee brace and scheduled Dantzler to be seen by the doctor. *Id.*

Dantzler was transferred to Clarinda on January 6, 2021. Defs.' Appx. Supp. Mot. Summ J. 4, ECF No. 21-3 (Offender Movement Summary).

Defendant Tonia Baldwin has been a physician at the Clarinda Correctional Facility since

2007. ECF No. 21-3 at 31 (Baldwin Affidavit). She first examined Dantzler on January 8, 2021. ECF No 22 at 25. She noticed Dantzler was not wearing his knee sleeve, but that there was marked swelling around his knee. *Id.* She did not find any meniscal tear on exam. *Id.* She directed Dantzler to wear the knee sleeve and take ibuprofen for two weeks. *Id.* at 26. If the knee continued to be swollen, she would consider aspiration and cortisone injection, but if the swelling was down, she would start him on physical therapy. *Id.* She gave Dantzler a lower bunk assignment, restricted physical activity for one month, and gave permission for him to have a brace/walker and "knee stabilized brace." *Id.* Dantzler avers "[a]ll medical equipment (braces, canes, crutches, etc.) along with medication [are] taken upon arrival/transfer to any new facility" and then reissued by the new institution. ECF No. 46 at 24. He states his knee sleeves and ibuprofen were removed from his possession as he informed Baldwin when she examined him. *Id.; see also* ECF No. 22 at 26 (noting Dantzler's statement that ibuprofen was confiscated when transferred to Clarinda).

At a follow up appointment on January 22, 2021, Baldwin observed "marked improvement" in Dantzler's knee. ECF No. 22 at 28. She noted Dantzler was only taking ibuprofen one to two times a day because it hurt his stomach. *Id.* She advised him to take the medication with food, and renewed the ibuprofen for two more weeks. *Id.*

Dantzler reported injuring his knee again on February 28, 2021, while he was walking laps. *Id.* at 30. He stated it made a "popping noise" at the time of injury and his knee was swollen again. *Id.* He stated he believed his knee was more than sprained because it had been injured since February 2020. *Id.* The nurse observed Dantzler was "ambulating with steady gait . . . [n]o limping, guarding or grimacing noted," although she did observe Dantzler's knee was swollen and tender. *Id.* The nurse issued Dantzler ibuprofen, restricted his sports activity for two weeks, and scheduled an appointment for Dantzler to see the doctor. *Id.* The nurse also particularly noted Dantzler "was not wearing knee brace today." *Id.*

Baldwin saw Dantzler on March 3, 2021. *Id.* at 32. He described how he had been walking and when he went to take a step, a pain when through his knee and he was unable to extend it. *Id.* He reported there was a "pop" and although it did not immediately swell, it had by night. *Id.* He reported it hurt to "pivot [his] leg/knee to put on [his] socks," and that the pain was sharp and stinging. *Id.* Baldwin observed Dantzler's ligaments continue to be intact with no meniscal tear identified. *Id.* She did note swelling, inflammation, and tenderness in his right knee. *Id.* Baldwin diagnosed Dantzler with bursitis. *Id.* She noted he was wearing and would continue to use his knee sleeve. *Id.* She increased his ibuprofen dosage and gave him exercises to strengthen his leg. *Id.*

On March 30, 2021, Baldwin saw Dantzler for what he believed was a blood clot. *Id.* at 37. Dantzler also told Baldwin he did not want to return his knee brace when he still had pain. *Id.* Baldwin noted "slight swelling" on either side of his knee. *Id.* She reconfirmed her diagnosis of knee bursitis. *Id.* at 38. She also noted Dantzler was not currently wearing the knee sleeve and had not been taking the ibuprofen. *Id.* ("Pt. states he is tired of taking IBU b/c it is all he has been given for the past year whether he has knee pain, toothache, etc."). She allowed Dantzler to keep the knee brace for another month. *Id.* Dantzler disputes Baldwin's implication that he was noncompliant with treatment, explaining he "took [the] knee sleeve off before going to 'every' health services appointment . . . because it was easier to show his knee/injury if he had on jeans or sweatpants because shorts are not allowed to be worn in health services department." ECF No. 46 at 27. He also states it would have been impossible for Baldwin to know whether he was taking the ibuprofen because it was issued to him to take in his cell as needed. *Id.*

Baldwin next saw Dantzler on April 29, 2021, for pain and swelling in his knee, and increased pain when he did physical therapy exercises. ECF No. 22 at 40. She noted he was not wearing the knee sleeve, but could see where it had been. *Id.* She maintained her diagnosis of

bursitis in his right knee and noted his need for the knee sleeve and ibuprofen for longer. *Id.* Baldwin also wrote in her notes that Dantzler was "to kite if he gets laid down in October so that referrals to UIHC can be entered. If laid down, will order MRI and ortho referral." *Id.* Dantzler denies he ever told Baldwin he was due for parole October. ECF No. 46 at 28. He denies he agreed to wait for an MRI until he knew the outcome of his parole. *Id.* Dantzler avers that during the exam, Baldwin told him "[t]here is no way your knee is still swelling like this. I think we need to schedule you for MRI and ortho." *Id.* Dantzler states she then checked his charge and said, "I see you get run up for parole in October. If you get laid down, I'll schedule you for MRI and ortho." *Id.* Dantzler avers he asked why he needed to wait if there was a problem now, but she did not respond. *Id.*

On June 2, 2021, Dantzler requested and was issued more ibuprofen tablets. ECF No. 22 at 43.

On July 23, 2021, Baldwin did not see Dantzler but renewed permission for him to use a knee brace, and renewed her notation from April that "if pt got laid down from parole, need referral." *Id.* at 44–45.

On July 29, 2021, Plaintiff sent a kiosk message to Health Services, stating he had been called to return his knee brace even though he still had "quite a bit of fluid in [his] knee" and "excruciating pains in the morning." ECF No. 21-3 at 22 (Kiosk Message). He also renewed his request for an MRI. *Id.*

Baldwin replied the next day, assuring Dantzler he could keep the brace through October. *Id.* at 22. She also wrote, "Per our last discussion, you wanted to wait for MRI to be done if you did not get parole. If this has changed, let me know." *Id.*

On August 17, 2021, Dantzler was placed in administrative segregation pending a disciplinary report. ECF No. 21-3 at 38 (Hearing Decision).

On August 18, 2021, Dantzler requested ibuprofen for his knee and back. ECF No. 22 at 46. A seven-day supply of ibuprofen tablets was issued to Dantzler. *Id.*

Dantzler made another sick call request on August 20, 2021. ECF No. 22 at 47. He stated: "The pain in my knee is getting severe. I've sent several kites concerning this issue. I need an MRI done ASAP." *Id.* He reported having spoken with two other nurses informally about his pain, but nothing was done. *Id.* Because of his administrative segregation placement, Dantzler's knee brace was confiscated until the end of the investigation. *Id.* The nurse, however, issued a knee sleeve until the knee brace could be returned. *Id.* She also issued him ibuprofen. *Id.*

On August 25, 2021, a nurse saw Dantzler for cold symptoms. *Id.* at 49. He stated: "I really need to talk about my knee. I need an MRI. I been telling you for months. I need crutches or something." *Id.* The nurse noted Dantzler had been observed by two nurses when entering and leaving health services: "No change in gait noted. Gait steady and even." *Id.* Dantzler avers he could not have been observed entering or leaving health services "because he was escorted in through the back door by C/O Barry." EDF No. 46 at 33. He states he did not encounter any medical staff until they entered the room where he was waiting. *Id.* He contends video evidence will confirm that he did walk with a limp. *Id.*

On August 30, 2021, an administrative law judge found Dantzler guilty of the major rule violations. ECF No. 21-3 at 38.

On August 31, 2021, Dantzler filed a formal grievance, alleging he was being denied medical services and wanted an MRI "ASAP!!!" ECF No. 21-3 at 41 (Grievance Complaint).

Defendant Melissa Farnsworth worked as the Health Services Director at Clarinda Correctional Facility, and was on COVID-related leave from that position for approximately three weeks from mid-August 2021 until early September 2021. ECF No. 21-3 at 42 (Farnsworth Affidavit). In her absence, Dantzler sent multiple requests for medical care, noting increased pain

in his right knee. ECF No. 22 at 51. Farnsworth went to see Dantzler at his cell on September 9, 2021. *Id.* Farnsworth commented that Dantzler agreed "in April when he saw the doctor he was ok with waiting a while for an MRI or to see Ortho, but now that the pain has increased he wants to be seen." *Id.* Dantzler avers he never agreed to wait but repeatedly requested an MRI. ECF No. 46 at 34–35. Farnsworth scheduled Dantzler to see Baldwin the following week. ECF No. 22 at 51.

Baldwin saw Dantzler on September 16, 2021. *Id.* at 52. Baldwin reported worsening right knee pain, inability to extend his knee in the morning, and unable to squat without pain. *Id.* Baldwin observed Dantzler was wearing the knee sleeve, but there was no swelling in his knee on that day. *Id.* She also noted Dantzler was in administrative segregation and it was unlikely his parole would be granted. *Id.* Baldwin then gave orders for Dantzler to be seen by the University of Iowa Hospitals and Clinics radiology and orthopedics clinic for an MRI and evaluation for etiology and treatment options. *Id.* at 54.

On September 21, 2021, Plaintiff was transferred to the Iowa State Penitentiary. ECF No. 21-3 at 4. On October 14, 2021, Plaintiff was denied parole. *Id.* at 48 (Parole Denial).

On November 5, 2021, Plaintiff was examined at the University of Iowa Hospitals and Clinics by Orthopedist Laura Magrane, PA-C. ECF No. 22 at 57. An MRI showed "MFC cartilage defect, joint effusion, medial meniscal tear (possible root)." *Id.* at 60. After discussing surgical and nonsurgical options with Magrane, Dantzler consented "for a right knee arthroscopy, meniscal repair versus debridement and microfracture." *Id.* Dantzler avers he also told Magrane about pain in his left knee, but because she only had orders to treat his right knee, she did not order an MRI or x-ray for his left knee. ECF No. 46 at 46. Dantzler avers Magrane also "indicated" to him "that due to his delay in care a knee replacement would be needed in the next [two to three] years." *Id.* at 41.

Surgery on Dantzler's right knee was performed at the University of Iowa on January 12,

2022. ECF No. 22 at 70.

On May 4, 2022, Dantzler reported having pain in his *left* knee. ECF No. 22 at 74. In his sick call, he stated his left knee was swollen and the pain was increasing off and on, but he was "certain there [was] something wrong with it." *Id.* He believed his left knee felt similar to how his right knee felt when the meniscus was torn, describing it as "grinding, and swelling more and more with most activity and sometimes even walking." *Id.* Dantzler was already scheduled for a follow up appointment at the University of Iowa on May 11, 2022. *Id.* The physician at the Iowa State Penitentiary prepared orders for Dantzler be seen for both knees at that appointment. *Id.* He also ordered an x-ray of Dantzler's left knee for May 5, 2022. *Id.*

At the appointment on May 11, 2022, Magrane examined Dantzler and observed swelling in his left knee. *Id.* at 78. She also ordered an MRI of his left knee. *Id.* Dantzler avers Magrane explained to him that he had a torn meniscus and needed surgery on his left knee.[2] ECF No. 46 at 17. Dantzler had surgery on his left knee on August 10, 2022. ECF No. 22 at 80.

Two days prior to his left-knee, post-surgical appointment with the University of Iowa, Dantzler requested to have an MRI on his hip while he was there. ECF No. 22 at 81. He reported having pain in his hip when he sat for a period of time and then stood. *Id.* No MRI was ordered because there was no documentation of any hip issue and because it was too near the appointment at the University of Iowa. *Id.*

Magrane saw Dantzler again on August 26, 2022, as a follow up to his left knee surgery. ECF No. 22 at 82. He was released with no restrictions, *id.* at 85, and was to start therapy in two weeks. *Id.* at 83. At this appointment, Dantzler informed Magrane of tailbone pain especially when moving from sitting to standing and leaning back. *Id.* at 82. She discussed treatment options with

---

[2] The medical records from the May 11, 2022 preoperative consultation are not contained in Defendants' Confidential Appendix.

Dantzler regarding his tailbone, and noted if symptoms persist, "x-ray of the coccyx should be completed and possible consideration of MRI to rule out other pathology." *Id.* at 83.

On September 15, 2022, Dantzler made a sick call request for hip, tailbone, or pelvis pain upon standing. *Id.* at 86. He attributed this to a fall in 2021. *Id.*

On September 19, 2022, Dantzler reported right knee pain. ECF No. 22 at 88. Dantzler told Dr. Chase Newton at Iowa State Penitentiary that due to compensating from his right leg, he began to have left knee pain, and as a result, "[h]e ended up falling and landed on his tailbone." *Id.* at 88. He reported pain "shoot[ing] from his tailbone throughout his pelvis." *Id.* Dr. Newton ordered x-rays of Dantzler's pelvis and tailbone and gave permission for Dantzler to have a donut cushion for his symptoms. *Id.* at 88. The doctor reviewed the x-rays on September 26, 2022, and observed no fractures. *Id.* at 90. He did note arthritis of Dantzler's hip joints. *Id.* No other significant abnormalities were seen on the x-rays. *Id.*

Dantzler filed a formal grievance regarding his knee pain on August 31, 2021. ECF No. 21-3 at 41 (Grievance Complaint). He requested an "MRI—ASAP!!!" *Id.* Defendant Blythe Larson was employed at Clarinda Correctional Facility since September 2014, and is currently the treatment director there. ECF No. 21-3 at 44 (Larson Affidavit). On September 27, 2021, Larson denied Dantzler's grievance. *Id.* at 46 (Grievance Response). In so doing, she stated, "Due to the length of wait for an MRI at UIHC, Dr. Baldwin did not schedule you until you received your BOP decision because you would not have been able to go to the appointment due to your release." *Id.* She also stated "[i]t is the doctor's determination when someone is referred to UIHC and also regarding bunk restrictions and I cannot override that as this is her area of expertise." *Id.*

Dantzler appealed the grievance denial on October 4, 2021. *Id.* at 47 (Grievant Appeal Form). In his appeal he stated he wanted an "MRI done on both knees and hip…ASAP!!!" *Id.* Defendant Stephen Weis has been employed at Clarinda Correctional Facility since December 14,

2015, and has been the warden there from June 15, 2019, to the present. ECF No. 21-3 at 49 (Weis Affidavit). On October 18, 2021, Weis denied Dantzler's grievance appeal. *Id.* at 51. (Warden Appeal Response). He agreed it was for the doctor to determine when someone is referred to the University of Iowa Hospitals and Clinics. *Id.*

Dantzler appealed this denial to the central office on October 28, 2021, again asking for an MRI on both knees and hip. *Id.* at 53 (Grievant Appeal Form). Defendant Randy Gibbs is the Deputy Director of Institutional Operations with the Iowa Department of Corrections. ECF No. 21-3 at 54 (Gibbs Affidavit). Gibbs's signature is on the response denying Dantzler's grievance appeal. *Id.* at 56 (Central Office Grievance Response Form). However, Gibbs avers he did not personally review or respond to the grievance appeal but instead delegated his grievance appeal duties to Executive Officer I Rebecca Bowker. *Id.* at 54. He avers Bowker denied Dantzler's grievance appeal on November 16, 2021. *Id.*

## II.    LEGAL STANDARD

The Court will grant summary judgment if, viewing the evidence in the light most favorable to the nonmoving party, "no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The non-moving party receives the benefit of all reasonable inferences supported by the evidence, but has 'the obligation to come forward with specific facts showing that there is a genuine issue for trial.'" *Atkison v. City of Mt. View*, 709 F.3d 1201, 1207 (8th Cir. 2013) (quoting *Dahl v. Rice Cnty.*, 621 F.3d 740, 743 (8th Cir. 2010)).

To avoid an entry of summary judgment, the nonmovant must make a sufficient showing on every essential element of its case for which it has the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To show a fact is genuinely disputed, a party must support the assertion by

(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

The quantum of proof the nonmoving party must produce is not precisely measurable, but it must be enough evidence "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."); *Turner v. XTO Energy, Inc.*, 989 F.3d 625, 627 (8th Cir. 2021) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [factfinder] could reasonably find for the plaintiff." (quoting *Anderson*, 477 U.S. at 252)). "If there is a dispute, and a reasonable jury could return a verdict for either party, then summary judgment is not appropriate." *Redmond v. Kosinski*, 999 F.3d 1116, 1120 (8th Cir. 2021) (quoting *Jones v. Minn. Dep't of Corr.*, 512 F.3d 478, 482 (8th Cir. 2008)).

## III.   DISCUSSION

Defendants move for summary judgment, arguing 1) they were not deliberately indifferent to Dantzler's serious medical needs, or in the alternative, 2) they are entitled to qualified immunity. ECF No. 21 at 1. Dantzler alleges Baldwin's delay in scheduling his MRI based on a nonmedical reason constituted cruel and unusual punishment. ECF No. 1 at 5. He also alleges the denial of his grievances enabled the delay, further violating his Eighth Amendment rights. *Id.*

Defendants also ask the Court to grant their motion for summary judgment because Dantzler failed to timely resist. ECF No. 47 at 2. The Court first addresses Defendants' arguments as to the adequacy of Dantzler's resistance and then considers the merits of Defendant's motion for summary judgment.

### A.   Adequacy of Dantzler's Resistance

In resistance to the motion for summary judgment, Dantzler has filed a one hundred-page response which includes a Declaration in Opposition to Defendants' Motion for Summary Judgment, ECF No. 46 at 4–19; a Statement of Disputed Facts, *id.* at 20-67; a Statement of Disputed Factual Issues, *id.* at 68–69; and a brief in support of his resistance, *id.* at 70–76. He has attached affidavits and exhibits to his response as well. *Id.* at 77–99.

Defendants argue such a resistance is inadequate because it is unclear which material facts are disputed, whether the responses are argument or intended as sworn statements, and is not supported to specific references to the appendix. ECF No. 47 at 2. Defendants also contend the response is untimely. *Id.* at 1.

With respect to timeliness, the Court granted Dantzler extensions of time to file a resistance to the motion for summary judgment. *See e.g.* Order re: Plaintiff' Mot. to Compel; Mot. Reconsider; Rule 56(d) Motion, ECF No. 28; Text Order, ECF No. 35. The last order set May 30, 2023, as the final deadline to submit a resistance. Text Order, ECF No. 37.

The resistance is dated May 29, 2023, but postmarked June 1, 2023. ECF No. 46 at 3, 100. It was received by the Court on June 5, 2023. *Id.* at 1. Because a prisoner lacks control of a submission for filing after it has been delivered to prison officials, the document is considered "filed" on the date it is signed and turned over to the prison officials. *Houston v. Lack*, 487 U.S. 266, 270 (1988) (holding pro se notice of appeal entitled to such consideration); *see also Sulik v. Taney Cnty.*, 316 F.3d 813, 815 (8th Cir. 2003) (extending prison mailbox rule to

§ 1983 complaints), *overruled on other grounds by* 393 F.3d 785 (8th Cir. 2005). The Court concludes the documents were submitted to prison officials for filing on the date it was signed and will accept the documents as timely filed.

Defendants also argue the resistance is inadequate because Dantzler's responses "are not sworn affidavits or declarations and are seldom supported by references to portions of the appendix which support his contentions." ECF No. 47 at 2. Under the local rules of this district, "[e]ach individual statement of material fact must be concise, numbered separately, and supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the statement, with citations to the appendix." LR 56(a). In addition, "[a] response to an individual statement of material fact that is not expressly admitted must be supported by references to those specific pages, paragraphs, or parts of the pleadings, depositions, answers to interrogatories, admissions, exhibits, and affidavits that support the resisting party's refusal to admit the statement, with citations to the appendix containing that part of the record." LR 56(b). "The failure to respond to an individual statement of material fact, with appropriate appendix citations, may constitute an admission of that fact." *Id.*

The Court recognized Dantzler's response did not strictly comply with the requirements of Federal Rules of Civil Procedure 56, especially with the requirement as to whether they were made under penalty of perjury. Order to Properly Support Declaration 2, ECF No. 50. The Court also acknowledged Dantzler was proceeding pro se and should be given broad construction of his filings. *Id.; see also Rinehart v. Weitzell*, 964 F.3d 684, 687 (8th Cir. 2020) (pro se complaint "must be held to 'less stringent standards than formal pleadings drafted by lawyers'" (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam))). Pursuant to Federal Rule of Civil Procedure 56(e)(1), (4), the Court gave Dantzler an opportunity to correct this deficiency. ECF No. 50 at 3.

In response to the Court's order, Dantzler has now submitted a statement verifying that all the documents submitted in resistance to the motion for summary judgment were made under penalty of perjury.[3] Pl.'s Sworn Statement, ECF No. 51. The bulk of Dantzler's responses are numbered consistently with the numbered paragraphs of Defendants' Statement of Material Fact making it easy for the Court to follow his argument and understand which of Defendants' statement of material facts he disputes. He refers to the same medical documents used by Defendants to make his arguments.

Broadly construing Dantzler's submission, the Court finds the contents of the resistance fundamentally complies with the requirements of Rule 56, and will be given consideration by the Court. Even so, the Court will consider undisputed any statements by Defendants to which Dantzler does not specifically object and are specifically supported by the record.

## B.    Merits—Eighth Amendment

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotation marks and citations omitted). This includes the intentional denial or delay of access to medical care. *Id.* at 104–05.

"To prevail on an Eighth Amendment claim for deprivation of medical care, an inmate must show that the prison official was deliberately indifferent to the inmate's serious medical needs." *Schaub v. VonWald*, 638 F.3d 905, 914 (8th Cir. 2011). Deliberate indifference exists where the inmate has an objectively serious medical need and prison officials knew of but disregarded the serious medical need. *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 837 (1994) and *Estelle*, 429 U.S. at 105). Dantzler, however, has "no constitutional right to receive a particular or

---

[3] Dantzler's sworn statement was not postmarked until September 18, 2023, but the document was signed September 7, 2023. ECF No. 51 at 2–3.

requested course of treatment, and prison doctors remain free to exercise their independent medical judgment." *Saylor v. Nebraska*, 812 F.3d 637, 646 (8th Cir. 2016) (quoting *Meuir v. Greene Cnty. Jail Emps.*, 487 F.3d 1115, 1118 (8th Cir. 2007) (further citations omitted).

To prevail on his claim, Dantzler must show Defendants were more than negligent, but "must show grossly incompetent or inadequate care 'so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care.'" *Redmond*, 999 F.3d at 1120 (quoting *Dulany v. Carnahan*, 132 F.3d 1234, 1242 (8th Cir. 1997)). Where a claim is based on delay of care, the objective seriousness is measured by the effect of the delay, which is proven with "verifying medical evidence that the prison officials ignored an acute or escalating situation or that these delays adversely affected his prognosis." *Id.* at 1121 (quoting Holden v. Hirner, 663 F.3d 336, 342 (8th Cir. 2011)).

### 1.    Serious Medical Need

Defendants argue they were not deliberately indifferent to Dantzler because he did not "suffer[] from an objectively serious medical need." ECF No. 21-1 at 16. "A serious medical need is 'one that has been diagnosed by a physician as requiring treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" *Schaub*, 638 F.3d at 914 (quoting *Camberos v. Branstad*, 73 F.3d 174, 176 (8th Cir. 1995)). Whether a prisoner had an objectively serious medical need is a question of fact. *Hancock v. Arnott*, 39 F.4th 482, 486 (8th Cir. 2022) (quoting *Schaub*, 638 F.3d at 915).

Defendants argue there was no indication during Baldwin's treatment of Dantzler "that there was anything seriously wrong with [his] right knee." ECF No. 21-1 at 17. Baldwin avers she "saw him on numerous occasions during the roughly nine months he was at [Clarinda], and he was seen by other medical staff on many other occasions during that time." ECF No. 21-3 at 35. Baldwin treated Dantzler conservatively with ibuprofen, exercises, a knee sleeve, and restrictions.

16

*Id.* She states "[t]here was no indication during my treatment of [Dantzler] that there was anything seriously wrong with his right knee." *Id.* at 36. According to Baldwin, Dantzler "was routinely observed to have no issues with his gait, range of motion, or strength in his right leg." *Id.* Based on her examinations, "his knee was structurally intact." *Id.* She states Dantzler "was also routinely observed to be continuing to exercise, not wear his knee sleeve, and not taking [ibuprofen] as prescribed, which tended to indicate his right knee issue was not serious. *Id.*

Dantzler disputes Baldwin's conclusion there was no indication anything was seriously wrong with his knee. ECF No. 46 at 65. He states every time he had an encounter with her, he "described every symptom of a torn meniscus to her." *Id.* at 65–66 (describing pain, swelling, popping sensation, difficulty standing and pivoting). He avers that during the nine months he was at Clarinda, there was only one month that he did not complain about his knee pain. ECF No. 46 at 56. The medical records support Dantzler's argument that he regularly and consistently told Baldwin and other medical staff he had chronic knee pain with swelling and weakness in the knee. *See generally* ECF No. 22 at 25–54.

Dantzler also disputes Baldwin's characterization that he was noncompliant with the treatment regimen. ECF No. 46 at 51. Dantzler avers he was "allowed to do rehab exercises, take [ibuprofen], wear knee sleeve all in his cell away from and out of view from all prison officials." *Id.* He asserts there was "no way" prison officials could have observed whether he was complying with the treatment directives on a daily basis. *Id.*

Dantzler avers all medical equipment and medication is confiscated upon transfer to any new facility and then re-issued. ECF No. 46 at 24. He states this happened when he was transferred to Clarinda on January 6, 2021, and explains why he did not have his knee sleeve when he initially met with Baldwin on January 8, 2021. *Id.*; *see also* ECF No. 22 at 26 (noting personal use ibuprofen not returned to Dantzler when he transferred to Clarinda). Dantzler also avers he removed the knee

sleeve before going to "every" appointment "because it was easier to show his knee/injury if he had on jeans or sweatpants." ECF No. 46 at 27. This is supported by the medical notes from April 29, 2021, where Baldwin observed Dantzler was not currently wearing the sleeve, but she could see where it had been. ECF No. 22 at 40; *see also id.* at 32 ("He will cont. with the knee sleeve (which he is wearing).").

Dantzler avers he did not always take ibuprofen because it made him nauseous. ECF No. 46 at 22. This is consistent with notes made by Baldwin at his January 22, 2021 appointment where Baldwin advised Dantzler to take the ibuprofen with food to help with stomach discomfort. ECF No. 22 at 28. Dantzler asserts it was not possible for Baldwin to know whether he took the ibuprofen because he was allowed to take it in his cell. ECF No. 46 at 27.

Finally, Dantzler disputes the medical notes which describe him walking with a normal gait. *Id.* at 32–33. He avers he was escorted through the back door of the medical unit and only encountered medical staff when they entered the room where he was waiting. *Id.* at 33.

Based on the description of Dantzler's symptoms and the dispute of facts about whether Dantzler complied with treatment, the Court concludes a reasonable jury could find that Dantzler's knee pain over this period, which he made known to prison staff and is medically consistent with a torn meniscus, was an objectively serious medical need under the Eighth Amendment.

2.      Deliberate Disregard

In addition to an objectively serious medical need, Dantzler must also show that the Defendants knew of and disregarded his need. *See Farmer*, 511 U.S. at 837. It is not enough to show Defendants were negligent, but Dantzler "must show grossly incompetent or inadequate care 'so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care.'" *Redmond*, 999 F.3d at 1120 (8th Cir. 2021) (citing *Dulany*, 132 F.3d at 1242). This may be shown by medical treatment that is a significant departure from professional standards. *Id.*

a.     Baldwin

Baldwin states she was not deliberately indifferent to the pain in Dantzler's knee, as she and other medical staff saw him on numerous occasions during the roughly nine months he was at Clarinda. ECF No. 21-3 at 35. As a medical doctor, she opines "[k]nees can often take up to four months to heal with conservative management." *Id.* at 34. She avers she provided conservative but appropriate treatment based on her examinations of him and her diagnosis. *Id.* She argues "[t]his is not a situation where health care decisions were made on a nonmedical basis." ECF No. 21-1 at 17.

Nothing in the Eighth Amendment prevents prison doctors from exercising their independent professional judgment. *Long v. Nix*, 86 F.3d 761, 765 (1996) ("Prison officials do not violate the Eighth Amendment when, in the exercise of their professional judgment, they refuse to implement a prisoner's requested course of treatment."); *see also Don/McC Cook/Solo v. Stieve*, 701 F. App'x 533, 534 (8th Cir. 2017) (per curiam) (reaffirming *Long*). The Court finds that on this record, there is no genuine dispute of fact that Baldwin's initial decision to treat Dantzler with ibuprofen, knee sleeves, and other conservative treatment was medically justified and within the scope of her independent professional judgment.

However, by April 29, 2021, Baldwin recognized Dantzler's knee was not improving and he needed to be referred to the University of Iowa Hospitals and Clinics for an MRI and an orthopedist appointment. *See* ECF No. 22 at 40. Baldwin noted Dantzler was up for parole in October. *Id.* She wrote, "pt to kite if he gets laid down in October so that referrals to UIHC can be entered. If laid down, will order MRI and ortho referral." *Id.* Baldwin repeated this order July 23, 2021. *Id.* at 44 ("if pt got laid down from parole, need referral, see April notes"). Baldwin avers she discussed delaying the referral with Dantzler and he agreed.  ECF No. 21-3 at 32.

Dantzler adamantly disputes Baldwin's version of events. He avers he never volunteered

or otherwise stated he would be considered for parole in October 2021. ECF No. 46 at 28. Moreover, he avers he never agreed to this course of action. *Id.* According to Dantzler, "[d]uring this encounter, [Baldwin] said, 'there is no way your knee is still swelling like this. I think we need to schedule you for MRI and ortho.'" *Id.* Dantzler avers Baldwin then checked his chart and saw he was scheduled for a parole review in October. *Id.* Baldwin told Dantzler if he is denied parole, she would schedule him for an MRI and an orthopedic appointment. *Id.* Dantzler contends he asked why he had to wait six months when the need for an MRI was immediate. *Id.* He avers Baldwin did not reply but "continued to type on her computer." *Id.* He argues it would have been inconsistent to agree to a delay in treatment given his repeated complaints of pain and requests for an MRI. *Id.* at 55.

Also according to Baldwin, "it did not make sense to set an appointment for him after he was expecting to be released, as he stated he was not going to follow up at [the University of Iowa] after his release." ECF No. 21-3 at 34–35. Dantzler disputes he declined to be treated at the University of Iowa after he was released. ECF No. 46 at 54. He avers he was never asked whether he would follow up at the University of Iowa, and argues there is no notation in the medical records to support Baldwin's statement regarding follow-up treatment at the University of Iowa. *Id.* at 53–54.

Even where some care has been provided, "medical treatment may so deviate from the applicable standard of care as to evidence a physician's deliberate indifference." *Redmond*, 999 F.3d at 1120 (quoting *Moore v. Duffy*, 255 F.3d 543, 545 (8th Cir. 2001)); *see also Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990) (holding constitutional violation may be found where the defendant "so deviated from professional standards that it amounted to deliberate indifference"); *Goodloe v. Sood*, 947 F.3d 1026, 1029 (7th Cir. 2020) ("[W]hen a doctor is aware of the need to undertake a specific task and fails to do so, the case for deliberate indifference is particularly

strong.").

"To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). Healthcare decisions made on a nonmedical basis are not based on accepted professional standards and may constitute deliberate indifference. *See Fields v. Gander*, 734 F.2d 1313, 1315 (8th Cir. 1984) (alleging defendants refused to provide dental care until previous dental bill paid); *see also Stiltner v. McPeak*, Civil Action No. 7:14-cv-00350, 2015 WL 2240724, at *5 (W.D. Va. May 12, 2015) ("[H]ealth care decisions based solely upon cost considerations without any medical rationale violate the Eighth Amendment when such decisions put an inmate at risk of experiencing significant pain." (listing cases)).

Again, it was not Baldwin's initial choice of conservative treatment for Dantzler that is at issue here. Rather, the question is whether her subsequent decision to delay the referral was based on nonmedical considerations, namely, whether Dantzler would be paroled. On this record, Dantzler has created a material fact issue as to whether Baldwin was deliberately indifferent to his knee pain by delaying the MRI and orthopedic referral based on his parole eligibility.

i.    Verifying Medical Evidence

Where a plaintiff alleges a delay in medical treatment violated his or her Eighth Amendment rights, "the objective seriousness of the deprivation should also be measured by reference to the effect of delay in treatment." *Presson v. Reed*, 65 F.4th 357, 366 (8th Cir. 2023) (quoting *Laughlin*, 430 F.3d at 929). Consequently, a plaintiff making such a claim "must present verifying medical evidence that the prison officials ignored an acute or escalating situation or that these delays adversely affected his prognosis." *Id.* at 366–67 (quoting *Redmond*, 999 F.3d at 1121). It is not enough for a plaintiff to submit evidence of his ultimate diagnosis and treatment to show

the delay in treatment had a detrimental effect. *Laughlin*, 430 F.3d at 929. Nor is it sufficient for a plaintiff to rely on his own claims of pain and suffering if they are not supported by "corroborating evidence of symptoms." *Hancock v. Arnott*, 39 F.4th 482, 487 (8th Cir. 2022).

Defendants argue Dantzler presents no verifying medical evidence to show any alleged delay in medical treatment had a detrimental effect on Dantzler's ultimate prognosis. ECF No. 21-1 at 18. Although he does not have the testimony of a medical expert[4], Dantzler relies on the existing medical records to corroborate his claims that the delay in treatment caused him prolonged pain as well as the need to have surgery on his left knee.

The medical records corroborate his allegations of continued and increasing pain and swelling. Dantzler began reporting pain in his right knee in February 2020 while he was incarcerated at Anamosa. ECF No. 22 at 4; *see also id.* at 9 (March 2020, reporting reinjury); *id.* at 11 (March 2020, reporting pain); *id.* at 15 (reporting re-injury and pain); *id.* at 23 (December 30, 2020, reporting continued pain). Immediately after being transferred to Clarinda, he reported pain and swelling in his right knee. *See id.* at 25 (January 8, 2021, reporting history of knee pain, current symptoms, and current treatment). He continued to report pain and/or swelling to medical staff consistently through the first part of 2021. *See id.* at 28 (January 22, 2021); *id.* at 30 (February 28, 2021); *id.* at 32 (March 3, 2021); *id.* at 35 (March 30, 2021); *id.* at 40 (April 29, 2021). In August 2021, Dantzler complained his knee pain was worsening and repeated his request for an

---

[4] In his Declaration in Opposition to Defendants' Motion for Summary Judgment, Dantzler states Magrane explained to him at a follow-up appointment that "his knees will always have issues. Plaintiff will need a knee replacement in the 'right' knee. She informed him that both will have issues but as long as the knee doesn't lock, there's nothing she could do to further alleviate the pain." ECF No. 46 at 17. He also states Magrane told him at the first appointment with her that he had "damage to his right knee, and that due to his delay in care, a knee replacement would be needed in the next two to three years." ECF No. 46 at 42. Dantzler does not provide any medical reports to authenticate these statements, and accordingly, the Court will not consider them as verifying medical evidence.

MRI. *Id.* at 47 (August 20, 2021); *id.* at 49 (August 25, 2021). He reported worsening pain in September as well. *See id.* at 51 (September 9, 2021, reporting pain "getting worse"); *id.* at 52 (September 16, 2021, reporting Dantzler was reporting worsening right knee pain).

Additionally, on May 4, 2022, he told the nurse he was experiencing increased swelling and pain in his left knee similar to how his right knee felt before surgery. ECF No. 22 at 74. He was referred to the University of Iowa for an x-ray and to have both knees examined. *Id.* Eventually, Dantzler did have surgery on his left knee. *Id.* at 80. On September 19, 2022, Dr. Chase Newton saw Dantzler at Iowa State Penitentiary. *Id.* at 88. At the appointment, Dantzler reported "right knee pain. He had torn meniscus and microfracture of his right femur. Due to compensating from his right leg he started getting left knee pain. He ended up falling and landed on his tailbone. When he sits or stands up he has pain that shoots from his tailbone throughout his pelvis." *Id.* It cannot be determined on this record whether the delay in care caused injury to his left knee, but Dantzler has verifying medical evidence to corroborate his claims to create a genuine dispute of fact that it did.

These treatment notes corroborate Dantzler's complaints of continued and worsening knee pain. In response, medical staff attempted to treat his condition with knee sleeves, braces, exercise, ibuprofen, and eventually surgery. Thus, Dantzler has presented verifying medical evidence to establish the detrimental effect of delay in medical treatment.

ii.     Qualified Immunity

Even if Dantzler can show a genuine issue of fact exists regarding whether his Eighth Amendment rights were violated, Baldwin argues she is entitled to qualified immunity "because no reasonable medical professional would have believed that her treatment of [Dantzler] would amount to a constitutional violation." ECF No. 21-1 at 21.

"The doctrine of qualified immunity protects government officials 'from liability for civil

damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The immunity is an immunity from suit, not merely from liability," and protects government officials sued in their individual capacities from the costs of trial or broad-reaching discovery. *Hamner v. Burls*, 937 F.3d 1171, 1175 (8th Cir. 2019).

Qualified immunity involves a two-step inquiry: "(1) whether the facts taken in a light most favorable to [the plaintiff] make out a violation of a constitutional [or statutory] right; and (2) whether that right was clearly established at the time of the defendant's alleged misconduct." *Burbridge v. City of St. Louis*, 2 F.4th 774, 780 (8th Cir. 2021) (internal quotation marks and citation omitted) (alterations in original). A defendant does not violate "a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014). There need not be "a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam). Moreover, courts must avoid defining "clearly established law at a high level of generality." *Id.* (internal quotation marks and citations omitted).

The cases clearly establish the intentional denial or delay of access to medical care may violate the Eighth Amendment. *Dadd v. Anoka Cnty.*, 827 F.3d 749, 756 (8th Cir. 2016) (citing *Estelle*, 429 U.S.at 104–05). This includes delaying treatment of a painful medical condition, even the condition is not life-threatening. *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. 2010) (holding no qualified immunity where defendants knew of complaints about receiving deficient medical care).

Further, as stated above, it is well-established that a delay in care based on nonmedical considerations may also violate the Eighth Amendment. *See Fields*, 734 F.2d at 1315. Thus, a reasonable official in Baldwin's shoes would have understood that a delay in referring Dantzler for an orthopedic consultation and MRI based on whether he was eligible for parole would be a violation of his Eighth Amendment rights. Baldwin is not entitled to qualified immunity.

   b.   Larson, Weis, and Gibbs

Dantzler alleges Baldwin's delay in treatment initially violated his constitutional rights, but he further alleges the failure of Larson, Weis, or Gibbs to intervene and overrule this plan of care by denying his grievances and appeals additionally violated his Eighth and Fourteenth Amendment rights. ECF No. 1 at 5; *see also* ECF No. 46 at 74–75 (asserting Weis, Larson, and Gibbs are liable for alleged due process violations). Under either theory, his claims against these defendants fail.

On September 7, 2021, Dantzler filed a grievance complaint asking for an "MRI— ASAP!!!" ECF No. 21-3 at 41. Dantzler was transferred to the Iowa State Penitentiary on September 21, 2021. *Id.* at 4.

Larson, the treatment director at Clarinda, denied Dantzler's grievance on September 27, 2021. *Id.* at 46. Larson wrote in response,

> Due to the length of wait for an MRI at UIHC, Dr. Baldwin did not schedule you until you received your BOP decision because you would not have been able to go to the appointment due to your release. It is the doctor's determination when someone is referred to UIHC and also regarding bunk restrictions and I cannot override that as this is her area of expertise. I would encourage you to continue to work with Health Servies at ISP regarding this condition.

*Id.*

Dantzler appealed this decision on October 4, 2021, asserting in part that Larson "refused to view these attachments from another grievance I put in concerning this same issue, [saying] I'm

busy. I don't have time to read all that." *Id.* at 47. Weis denied the appeal, stating he had reviewed all the information and concurred with the initial grievance investigation and decision. *Id.* at 51. He also noted that Dantzler had an appointment scheduled in November 2021 with the University of Iowa orthopedic clinic and radiology. *Id.*

Dantzler then appealed to the central office of the Iowa Department of Corrections on October 28, 2021. *Id.* at 53. On this appeal, Dantzler requested an MRI on both of his knees and hip. *Id.* He again asked to have his knee treated because he continued to believe there was "some structural damage." *Id.* At the time, Gibbs was the Deputy Director of Institutional Operations with the Iowa Department of Corrections. *Id.* at 54. He avers that at the time Dantzler submitted his grievance appeal, Gibbs delegated his grievance appeal duties to Bowker. *Id.* Even if true, Gibbs's signature was on the response, and nothing in the response reflects the appeal was reviewed by Bowker. *Id.* at 56. The appeal was denied, noting Dantzler's upcoming appointments at the University of Iowa. *Id.*

First, in order to show a violation of the Eighth Amendment, the inmate must have an objectively serious medical need and prison officials knew of but disregarded the serious medical need. *Schaub*, 638 F.3d at 914. Dantzler does not demonstrate any of these defendants disregarded his medical needs.

By the time Larson responded to the grievance on September 27, 2021, and Weis affirmed the decision on October 18, 2021, Dantzler had already been moved to Iowa State Penitentiary. Because Dantzler was no longer at Clarinda at the time they made their decisions, neither Larson nor Weis had authority to influence any decisions regarding Dantzler's medical care.

Further, Baldwin scheduled the MRI and referral on September 16, 2021. ECF No. 22 at 54. By the time any of these Defendants responded to the grievance or appeal, Dantzler had received the relief he was seeking, namely, an MRI. Thus, their responses did not deny or delay

Dantzler any medical care.

Neither may Dantzler's claims under the Fourteenth Amendment proceed. A grievance procedure is a procedural right only, and confers no substantive rights upon the inmates. *Buckley v. Barlow*, 997 F.2d 494, 495 (8th Cir. 1993) (per curiam). The denial of grievances in and of itself cannot support a substantive constitutional claim. *Lomholt v. Holder*, 287 F.3d 683 (8th Cir. 2002) (per curiam). The failure of prison officials to adequately consider his grievances does not, without more, state an actionable claim. *King v. Houston*, 556 F. App'x 561, 562–63 (8th Cir. 2014) (per curiam).

Dantzler argues none of these defendants made a sufficient inquiry into his claims. He argues none of these defendants ever interviewed him or any other witnesses and only concurred with the decision of the original grievance officer. *See* ECF No. 46 at 14–15. Even if true, however, the prison grievance procedure confers no substantive rights, and these allegations fail to state a due process violation.

Dantzler has failed to create a genuine issue of material fact as to whether these defendants violated Dantzler's Eighth or Fourteenth Amendment Rights. Consequently, summary judgment against these defendants is granted.

c.     Farnsworth

Farnsworth was the health services director at Clarinda. ECF No. 21-3 at 42. Dantzler alleges Farnsworth violated his Eighth Amendment rights by participating in the delay in treatment. ECF 1 at 5. Farnsworth was on leave for several weeks beginning in mid-August. *Id.* Dantzler had sent "multiple" messages to her in her absence. ECF No. 22 at 51. Dantzler was told the messages would be forwarded to her, but the messages went unanswered. *Id.*

On September 9, 2021, Farnsworth went to Dantzler's cell. *Id.* Dantzler told her about the increased right knee pain and his request to be seen for the pain. *Id.* Farnsworth noted Dantzler

agreed with Baldwin as to "waiting a while for an MRI or to see Ortho, but now that the pain has increased he wants to be seen." *Id.* Farnsworth then scheduled Dantzler to see Baldwin the next week. *Id.* Baldwin did see Dantzler on September 16, 2021, during which time she referred him for an MRI and orthopedist appointment. *Id.* at 52–53.

Again, Dantzler disputes he ever said he agreed to wait for an MRI. ECF No. 46 at 34. He states he "demanded" an MRI on multiple times in July and August 2021, and argues this number of requests "is not consistent with an individual who agreed to or is willing to wait for an MRI/relief." *Id.* at 35.

Even though Dantzler contests the truthfulness of this statement, it has no bearing on whether Farnsworth was deliberately indifferent to his serious medical needs. Upon learning that Dantzler continued to be in pain, she agreed he should be seen by the doctor and immediately scheduled an appointment with Baldwin for the next week. ECF No. 21-3 at 43; *see also* ECF No. 22 at 51. Even Dantzler agrees it was when Farnsworth interceded and arranged another appointment with Baldwin that a referral was made. ECF No. 46 at 57. Dantzler does not state what other action Farnsworth should or could have taken to eliminate any further delay in treatment.

On this record, there is no genuine issue of material fact that Farnsworth was not deliberately indifferent to Dantzler's serious medical needs. Summary judgment is granted in her favor.

## IV.    CONCLUSION

For the forgoing reasons,

**IT IS ORDERED** that Defendants Tonia Baldwin, Melissa Farnsworth, Stephen Weis, Randy Gibbs, and Blythe Larson's Motion for Summary Judgment, ECF No. 21, is **GRANTED in part and DENIED in part**. Summary judgment is granted as to Farnsworth, Weis, Gibbs,

and Larson. Summary judgment is denied as to Baldwin.

**IT IS SO ORDERED.**

Dated this 28th day of September, 2023.

REBECCA GOODGAME EBINGER
UNITED STATES DISTRICT JUDGE